**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**UNITED STATES OF AMERICA**                    :
                                                         :
        **v.**                                   :     **No. 10 Cr. 69 (VM)**
                                                         :
**MARK KURLAND**                                    :
                                                         :
            **Defendant.**                :
                                                         :
-------------------------------------------------------------X


### DEFENDANT MARK KURLAND'S SENTENCING MEMORANDUM

**DLA PIPER LLP (US)**
**Patrick J. Smith**
**Theodore A. Altman**
**Jeffrey D. Rotenberg**
**1251 Avenue of the Americas**
**New York, NY 10020**
**(212) 335-4500**

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL BACKGROUND ...........................................................................2

MARK'S PERSONAL HISTORY ...........................................................................3

    A.      Mark's Upbringing .............................................................................4

    B.      Education ...........................................................................................4

    C.      Marriage and Family .........................................................................4

    D.      Mark's Career ...................................................................................5

          1.      Early Years .........................................................................5

          2.      Mabon Nugent ...................................................................5

          3.      Bear Stearns .......................................................................6

          4.      New Castle .........................................................................6

    E.      Mark's Regulatory Compliance Record .............................................8

    F.      Mark's Philanthropy ..........................................................................8

    G.      Mark's Cancer and Other Health Issues ..........................................10

    H.      Mark's Care for His Mother ............................................................11

MARK'S PARTICIPATION IN THE OFFENSE CONDUCT ................................12

ARGUMENT ......................................................................................................14

I.      THE COURT SHOULD IMPOSE A SENTENCE OF PROBATION ...........................14

    A.      Federal Sentencing Framework ........................................................15

    B.      Guidelines Considerations ...............................................................15

          1.      Advisory Guidelines Range ..............................................16

          2.      Mark Qualifies as a Minor Participant in the Offense Conduct .............17

          3.      A Downward Departure From the Guidelines Range Based Upon Mark's Health Issues Is Supported ..........................................................20

    C.      The Nature and Circumstances of Mark's Offense Support a Below-Guidelines Sentence of Probation Under Section 3553(a)(1) .............21

          1.      Mark's Offense Conduct is Not Typical of Insider Trading Defendants ....................................................................21

          2.      Mark Did Not Profit Personally ........................................22

          3.      Mark Did Not Seek to Exploit Inside Information ...................................22

          4.      Gain Is A Terrible Measure of Culpability In This Case .........................22

**TABLE OF CONTENTS**
(continued)

**Page**

D.    A Sentence of Probation Would Promote Consistency in Sentencing .................24

    1.    Insider Trading Sentences in this District Demonstrate That Probation Is Appropriate .........................................................24

    2.    The Resolution of the Criminal Case Against Robert Moffat Supports Imposing a Sentence of Probation.............................27

E.    Mark's Personal History and Characteristics Are Mitigating Factors Supporting a Below-Guidelines Sentence of Probation Under Section 3553(a)(1) ...................................................................28

F.    A Sentence of Probation Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment for the Offense, Affords Adequate Deterrence to Criminal Conduct, and Protects the Public from Further Crimes of the Defendant ................................31

CONCLUSION ...........................................................................34

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bateman, Eichler, Hill Richards, Inc. v. Berner,*
   472 U.S. 299 (1985) ..................................................................................25, 26

*Gall v. United States,*
   552 U.S. 38 (2007) ............................................................................ 15, 31, 32

*Kimbrough v. United States,*
   552 U.S. 85 (2007) ........................................................................................ 15

*Nelson v. United States,*
   129 S.Ct. 890 (2009) ..................................................................................... 16

*Rita v. United States,*
   551 U.S. 338 (2007) ...................................................................................... 16

*SEC v. Thome,*
   638 F. Supp 596 (S.D.N.Y. 1986) ................................................................ 26

*United States v. Booker,*
   543 U.S. 220 (2005) ...................................................................................... 15

*United States v. Brady,*
   2004 WL 86414 (E.D.N.Y. Jan. 20, 2004) ................................................... 31

*United States v. Carmona-Rodriguez,*
   2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) ................................................. 32

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) .......................................................................... 27

*United States v. Crosby,*
   397 F.3d 103 (2d Cir. 2005) .......................................................................... 15

*United States v. Cusimano,*
   123 F.3d 83 (2d Cir. 1997) ......................................................................17, 20

*United States v. Geibel,*
   369 F.3d 682 (2d Cir. 2004) .......................................................................... 17

*United States v. Hernandez,*
   2005 WL 1242344 (S.D.N.Y. May 24, 2005) ............................................... 32

*United States v. Jimenez,*
    212 F. Supp. 2d 214 (S.D.N.Y. 2002) ...........................................................20, 21

*United States v. Jones,*
    460 F.3d 191 (2d Cir. 2006) ...............................................................................15

*United States v. Lopez,*
    937 F.2d 716 (2d Cir. 1991) ...............................................................................17

*United States v. Pena,*
    33 F.3d 2 (2d Cir. 1994) .....................................................................................17

*United States v. Rahman,*
    189 F.3d 88 (2d Cir. 1999) .................................................................................17

*United States v. Rioux,*
    97 F.3d 648 (2d Cir. 1996) .................................................................................21

*United States v. Teicher,*
    987 F.2d 112 (2d Cir. 1993) ...............................................................................17

*United States v. Vaughan,*
    1993 WL 119704 (S.D.N.Y. Apr. 15, 1993) ......................................................21

*United States v. Wills,*
    476 F.3d 103 (2d Cir. 2007) ..........................................................................27, 28

*United States v. Yu,*
    285 F.3d 192 (2d Cir. 2002) ...............................................................................20

**STATUTES**

15 U.S.C. § 78j(b) ........................................................................................................3

15 U.S.C. § 78ff .........................................................................................................3

15 U.S.C. § 78u(d)(2) ...............................................................................................26

18 U.S.C. § 371 .......................................................................................................2, 3

18 U.S.C. § 3553(a) ..........................................................................15, 16, 21, 24, 28

**OTHER AUTHORITIES**

*United States v. Ali Far,*
    09 Cr. 1009 (RPP) .............................................................................................19

*United States v. Ali Hariri*,
  10 Cr. 173 (RJH) ..............................................................................................19

*United States v. Babcock*,
  07 Cr. 154 (RJH) ..............................................................................................18

*United States v. Brien Santarlas*,
  09 Cr. 1170 (PKC)............................................................................................19

*United States v. Collotta*,
  07 Cr. 143 (VM) .........................................................................................17-18, 25

*United States v. Franklin*,
  07 Cr. 164 (GEL) .............................................................................................17

*United States v. Gansman*,
  08 Cr. 471 (MGC) ............................................................................................24

*United States v. Gautham Shankar*,
  09 Cr. 996 (VM) ..............................................................................................19

*United States v. Goehring*,
  05 Cr. 209 (JES) ..............................................................................................18, 25

*United States v. Holzer*,
  09 Cr. 470 (VM) ..............................................................................................17, 25

*United States v. Koulouroudis*,
  09 Cr. 440 (PGG) .............................................................................................25

*United States v. McDermott et al.*,
  00 Cr. 0061 (RO) ..............................................................................................25

*United States v. McKeever*,
  07 Cr. 42 (LAP)................................................................................................30

*United States v. Okada*,
  07 Cr. 144 (DC)................................................................................................18, 25

*United States v. Paparrizos*,
  09 Cr. 400 (PAC)..............................................................................................25

*United States v. Rajaratnam*,
  09-Cr-1184 (RJH).............................................................................................20

*United States v. Rajiv Goel*,
  10 Cr. 90 (AKH)...............................................................................................19

*United States v. Richard Choo-Beng Lee,*
    09 Cr. 972 (PKC)............................................................................................19

*United States. v. Robert Moffat,*
    10 Cr. 270 (NRB) ...........................................................................................18

*United States v. Roomy Khan,*
    09 Cr. 991 (RMB)............................................................................................19

*United States v. Steve Fortuna,*
    09 Cr. 1003 (SHS) ..........................................................................................19

*United States v. Xujia Wang, et al.,*
    07 Cr. 00730 ..............................................................................................18, 26

## PRELIMINARY STATEMENT

Mark Kurland managed money for a living.  By making smart decisions about the market and which stocks to trade, Mark consistently generated returns that beat both the market and his peers.  He had an unblemished record of success and integrity.  But in the summer of 2008, Mark made the worst decision of his life:  He destroyed the career and reputation he had carefully built over 25 years by allowing the funds he managed to trade while he had inside information about three companies.  Trading in two of these three companies generated significant losses; the third trade yielded about $900,000 in gain, which was of no consequence to the performance of a portfolio of approximately $1 billion.  Mark personally earned nothing and it was never part of any plan or discussion that he would.  As a result Mark is ruined professionally and faces a potential jail sentence.

In this memorandum, we seek to demonstrate that sending Mark to prison is unnecessary. We recognize that the advisory Sentencing Guidelines suggest that a term of imprisonment is appropriate.  Yet the lone factor that is driving the calculation to an offense level that suggests imprisonment is the $900,000 gross gain to the funds Mark managed, not to Mark personally. Every other relevant sentencing factor in this case indicates that a term of imprisonment is unwarranted and unnecessary.  The principal factors lining up in favor of a probationary sentence are:  (1) The circumstances of the offense feature no aggravated conduct and show that Mark is an insider trading defendant who is substantially less culpable that the "average" insider trading defendant; (2) Recent experience in the Southern District of New York shows that many similarly situated non-cooperating insider trading defendants have been sentenced to probation, with most others receiving sentences substantially below the advisory Guidelines range; (3) In this case, the government agreed to a probationary sentence for Robert Moffat, the co-

conspirator and insider who was the source of the information that led to all of the gross gain attributable to Mark; and (4) Mark's personal characteristics, including his history of charitable giving, health concerns and the needs of his aged mother.

To describe Mark's crime as a "mistake" risks minimizing the criminality of his conduct. Mark understands fully that he committed a crime and that consequences come with that crime. Mark's strong desire is to accept those consequences and to begin the process of rebuilding his life and directing his substantial energy and talent toward worthwhile goals.  As we hope is evident from the outpouring of support that Mark has received as part of this sentencing, Mark has a tremendous capacity for giving and compassion.  For example, on the evening of October 15, 2009, the day before his arrest, Mark attended a fundraiser he had organized to help launch the Rita Fund, a non-profit organization led by his daughter that promotes women's human rights activism, and to which he had already given a significant donation.  A sentence of probation will permit Mark to continue important work like this.

Regardless of his sentence, Mark's legacy is forever ruined.  He can no longer work in the profession he loved and thrived in.  Internet searches will always identify him first and foremost as an "insider trader," a convicted felon, and associate him with greed, selfishness and criminality.  This is Mark's own fault and he knows it.  He asks only for a just sentence and the opportunity to make tangible amends to his loved ones, friends and society.  A custodial sentence will accomplish nothing except delay his efforts to do so.

## PROCEDURAL BACKGROUND

Mark was arrested on October 16, 2009 following the filing of a criminal complaint charging him with conspiracy to commit insider trading, in violation of Title 18, United States Code, Section 371.  The complaint also named Danielle Chiesi, an analyst for New Castle

Partners LP ("New Castle"), the investment adviser that Mark co-owned, and Robert Moffat, a senior executive at IBM.  That same day, the government also arrested Raj Rajaratnam, manager of the Galleon Group of hedge funds, Rajiv Goel, a director of strategic investments at Intel Corp.'s investment arm and Anil Kumar, a director at McKinsey & Co.  The United States Securities & Exchange Commission ("SEC") also filed suit against Mark and others alleging insider trading violations largely paralleling those in the criminal complaints.  The so-called "Galleon" insider trading cases received significant media attention.

On January 27, 2010, pursuant to a written plea agreement with the government, Mark waived indictment and pleaded guilty to a two-count Information.  Count One of the Information charged that, from mid-August 2008 to in or about January 2009, Mark and others conspired to commit insider trading, in violation of Title 18, United States Code, Section 371, with respect to the stock of three companies:  Akamai Technologies, Inc. ("Akamai"), Advanced Micro Devices, Inc. ("AMD"), and Sun Microsystems Inc. ("Sun").  Count Two charged a substantive insider trading violation in the stock of AMD, in violation of Title 15, United States Code, Sections 78j(b) & 78ff.  Mark also admitted the forfeiture allegation in the Information and agreed to forfeit $900,000 to the United States.

Mark was the first defendant to enter a guilty plea in the "Galleon" insider trading cases who did not have a cooperation agreement with the government.

## MARK'S PERSONAL HISTORY

Mark is a humble, loyal, down-to-earth person who has never forgotten his working class roots, despite his financial success.  Others come first to Mark, so it is no surprise that he is devastated both physically and mentally by the harm and grief his crimes have caused his wife, his business, and his many friends and family members who love him, look up to him and rely on

him.  As someone whose life has been driven by a strong work ethic, and who embraces hard work with a sense of purpose and pride, Mark's loss of the business he built and the challenges and opportunities it presented will leave a huge void in his life until the day he dies.

## A.    Mark's Upbringing

Mark was born in Queens, New York on November 26, 1948, and spent most of his childhood in New Rochelle, New York.  Mark's father ran a small printing business and his mother was a housewife, raising him and his younger brother and sister.  Money was always tight in the Kurland household because his father's printing business yielded only a modest living.  Mark began working at the age of 13, taking on a paper route, mowing lawns, and doing other odd jobs around the neighborhood to supplement his father's income.  Mark's father once left a shoebox in Mark's closet for Mark to make any contributions he could to help out.  Mark learned at an early age that nothing would be handed to him and that there was no substitute for hard work if he was going to get anywhere in life.

## B.    Education

Mark attended Hofstra University on a partial academic scholarship, graduating in 1970 with a B.S. in Economics.  While at Hofstra, he worked various jobs and took out student loans to cover the portion of his tuition and living expenses not covered by his scholarship.  Mark then attended Bernard Baruch Graduate School of Business at night, while working full-time during the day – first at an investment advisory firm, The Dines Letter, and later at Manufacturers Hanover Trust.  Mark graduated from Baruch in 1973 with an MBA in Finance.

## C.    Marriage and Family

In 1971, Mark married his college girlfriend Peggy Braver and the young couple moved to Queens, before renting an apartment in Yonkers.  At the time, Peggy taught special needs

children at a New York City public school.  She would become that school's principal after continuing to work through the birth of two daughters, Samantha in 1976 and Heather in 1979. In 1977, the Kurlands purchased a house in Westchester County, where they have lived ever since.  Mark and Peggy have now been married for nearly 40 years.  Peggy is and has been Mark's best friend and anchor in life, and has provided him unwavering encouragement and support since his arrest.  *See* App., Tab 15.[1]

## D.  Mark's Career

### 1.  Early Years

After completing his MBA, Mark joined Pfizer in 1973 as a cost accountant, commuting daily from Queens to Pfizer's New Jersey office.  He moved to International Playtex as a financial analyst in its family products division three years later.  In 1977, he was promoted to director of finance for that division, with responsibility for all of its accounting and financial reporting.  In 1979, Mark accepted an offer to work for International Paper as a strategic planning manager, where he remained for four years.

### 2.  Mabon Nugent

Eager to enter the securities industry in 1982, Mark readily accepted a position as an analyst at Mabon Nugent, a mid-size brokerage firm.  He quickly rose through the ranks and was made co-head of the institutional equities department, in charge of sales, trading and research in 1988.  Mabon became a highly respected boutique research firm on Mark's watch.  In 1986, Mark became Mabon's first analyst to make the Institutional Investor magazine research team

---

[1] "App." refers to the Appendix, which is filed together with this memorandum.

and was selected by Institutional Investor as one of top stock pickers on the street in its March 1991 publication.  He later was made a general partner of Mabon.

    3.    Bear Stearns

    After Mabon sold its equity operation in 1990 amidst financial difficulties, Mark accepted the director of research position at Bear Stearns Corp.  The department grew in both headcount and renown under Mark's supervision.

    In 1995, Bear promoted Mark to chairman and CEO of the firm's asset management business.  Mark sat on the Equity Sub-Committee, which had responsibility for vetting new issues and secondary offerings, and the President's Committee, which oversaw firm policy. Robert Steinberg, Mark's supervisor, writes that he:

>           brought great credit to the firm as his department became known
>           for its well thought-out analysis. His in-depth and thoroughly
>           researched work was highly regarded for its honest and original
>           content.  Mark's management style is to speak directly with clarity;
>           he made it sacrosanct policy that there was to be integrity to the
>           distribution of information - fairness with no exceptions.

App., Tab 30.

    4.    New Castle

    Mark long wanted to return to research and trading and suggested to management that he start an equity hedge fund within Bear.  His proposal was approved and New Castle was formed as an investment adviser to several hedge funds ("the Funds").  Investors in the Funds included charitable foundations, pension funds, college endowments as well as high net-worth individuals. Shortly after JPMorgan purchased Bear in early 2008, it spun off New Castle as an independent entity.

    Mark and his partners shared equal responsibility for supervising the activities of the Funds and the analysts they employed, managing the Funds collaboratively and transparently.

They regularly discussed trading strategies and positions in an open and frank manner, and they each received trading records and portfolio positions daily.

The Funds' securities holdings typically consisted of 50 to 60 long positions and a similar number of short positions.  New Castle's analysts followed approximately 250 companies.  A large position generally comprised between 2.5% to 4% of the assets in each of the Funds.  New Castle's largest fund was "market neutral," which generally meant that investments were balanced amongst carefully researched long and short positions.  New Castle typically took long and short positions in the same security many times over the course of the year, including the likes of Akamai, AMD and Sun, depending on Mark's and his colleagues' views on the securities fundamentals and how they fit in the context of their overall economic outlook.  The neutral fund had an average annual return of 12% over the last 10 years.  This compared to about a 3% return for the market and a 5% return for the market neutral index (an industry standard performance benchmark).  During the financial crisis in 2008, the fund was up 4%, when the market was off about 29% and the market neutral index was down about 2%.

In managing New Castle and the Funds, Mark put his clients first.  He never held a personal trading account and always maintained a significant portion of his net worth in the Funds, aligning his interests with his investors.  He contributed new capital to the Funds annually and never withdrew any principal.  He discouraged his employees from personal trading to avoid any appearance of impropriety or potential conflict.

Unlike many other managers, New Castle permitted monthly assets withdrawals, without limitation.  This policy remained in place even after the onset of the financial crisis in 2008 when other funds froze assets citing liquidity issues.   In the same vein, New Castle operated transparently and with ample liquidity.   Investors could receive holdings information the same

day upon request and Mark freely spoke to investors about the management and operation of the Funds.  The Funds were unleveraged and priced to the market daily.  Every investor was treated equitably regardless of his or her contribution to the Funds.  *See generally* App., Tabs 4, 17, 25, 30.

**E.     Mark's Regulatory Compliance Record**

In his nearly three decades in the securities industry, Mark had an unblemished record. His usual approach towards rules and regulations is reflected in his self-reporting of a recent inadvertent violation of an SEC regulation by New Castle, as discussed in the letter provided by New Castle counsel and his friend, James Kaplan.  When the mistake was detected, it was brought to Mark's attention and he made the decision to report what had occurred to the SEC. Mark insisted over his lawyer's objection that he personally go to Washington to meet with the SEC to explain what happened.  The SEC acknowledged to him that the violation would almost certainly not have been detected by the regulators and they appreciated his being forthcoming. *See* App., Tabs 11.

**F.     Mark's Philanthropy**

Mark's philanthropy and charitable works are substantial.  Over the years, he has dedicated significant time and resources to charities and friends in need.  Mark has touched many through his desire to give.  His niece, Erica Grossman, a Washington DC police officer, writes, "[f]or as long as I can remember, my 'Uncle Mark' has been doing good deeds for the community in which he lives, and abroad.  Whenever I heard about my aunt and uncle in conversation, I was hearing about their experience at a charity event or what they were able to do for a friend, a stranger or an organization that was in need."  App., Tab 8.  Mark goes out of his

way to provide for others, whether assisting a friend seeking work, or offering guidance, advice and emotional support.

Of the many charities and institutions Mark supports, the St. Christopher School for Kids holds a special place in his heart.  This school "caters to children from broken homes, who lack the support systems and basic necessities essential in youth."  App., Tab 2.  Every Christmas for a decade, Mark has earmarked money New Castle generated through commissions (and that he and his other partners could have used for business or other expenses) to buy toys for these children.  When unable to obtain enough money for all of the toys through New Castle, Mark made up the difference himself.

A new labor of love for Mark is the Rita Fund – a global women's human rights organization that his daughter Heather started largely through his donation, before his arrest, of approximately $450,000.  These criminal charges have not stopped him from continuing his pre-arrest efforts to both promote the Rita Fund and assist in fundraising and investment guidance.  Going forward, to the extent his sentence permits, Mark will work closely with Heather in fundraising and reviewing and awarding grants.

Mark's charitable activities are heart-felt and truly selfless.   He "has never used his generosity as an opportunity for self-promotion.  He gives out of gratitude for his ability to help."  App., Tab 20.  Rabbi Howard J. Goldsmith summarizes it best when he writes, "the generosity, commitment to family, and loyalty to friends typify Mark's interactions with the world – a world surely made brighter by his presence."  App., Tab 6.

Mark assists with more than his just his wallet:

> [w]hat is special about Mark is that he gave not just monetarily to the underprivileged, the disadvantaged and the needy, but even more importantly, he gave of himself in guidance, advice and

> emotional support to those who came upon unfortunate times by
> lifting and helping them.  All of this was done without wanting
> recognition or acknowledgement … Mark did it all without any
> fanfare or elaboration of his kindness.  The other aspect of Mark
> that goes unnoticed is that the people he has helped, he has always
> kept their dignity intact so that they were uplifted, never
> diminished and always respected.

App., Tab 22.  Barry Slansky did not attend college and his wife Suzanne received an associate's degree.  They write that "[w]hen our son Adam was applying to college, Mark guided him through the process as though Adam were his own child, giving advice and writing letters of recommendation.  As a result, Adam graduated from Lehigh University and is now a special education teacher in the South Bronx."  App., Tab 29.  Proudly, at New Castle, Mark continued a practice he instituted at Mabon and carried through at Bear of inviting college students and other aspirants to spend their summers working alongside him and his analysts.  *See, e.g.*, App., Tab 30.  Mark often paid these interns out of his own pocket.

## G.    Mark's Cancer and Other Health Issues

Mark was diagnosed with prostate cancer in 2005.  Mark sought to keep his illness private, but when others needed support and guidance, Mark shared his ordeal.  Robert and Lucille Goldsmith recall that when cancer confronted their family "[f]rightened and not knowing which doctors to turn to, Mark reached out to us, sharing his own scary story (which he had quietly and discreetly kept to himself) and helped us attain the services of the right doctors at Memorial Sloan Kettering Hospital.  It is daunting to think what might have happened without his compassionate intervention."  App., Tab 7.  After surgery to remove his prostate and related treatment, Mark's cancer went into remission.  He undergoes regular testing to track whether the cancer has returned.

Mark has a history of hyperlipidemia and diabetes mellitus. *See* App., Tab 27. A June 2008 coronary CT angiogram showed evidence of plaque in all his coronary arteries, including a 30-50% stenosis in the right coronary artery, for which Mark is being treated with medication. *Id.* Mark's doctor instructed him to obtain regular monitoring of these potentially life-threatening conditions.

**H.    Mark's Care for His Mother**

Mark is a devoted son to his ailing mother Rosalie Kurland, who is 83 and suffers from early vascular dementia and depression. In 2009, as her dementia worsened, Mark arranged for his mother to live at the Atria, an assisted living facility near his home. Friends comment that he "has always been an exemplary model ... as he treats his aging mother with the utmost loving care and was never heard to balk about being with her, taking her places or the outright financial support that he generously gives her." App., Tab 7. He spends at least one day a week with his mother as well as most holidays. She looks forward to his visits very much, and her schedule generally revolves around them.

Mark is the family member with the greatest responsibility for his mother's care and well being. Lauren Safran who manages Mrs. Kurland's geriatric care program comments:

> Without Mark's presence Rosalie will regress both emotionally and cognitively. Her health will be compromised by lack of support and a major change in her routine. Mark has been a devoted son and his absence will be a huge loss for her.

App., Tab 24. The Atria's executive director similarly writes that "[w]ith [her] other children out of state and the passing of her husband … it is very important for her continued progress to have her son be able to visit with her." App., Tab 18. The Goldsmiths add that "[w]e shudder to think how his mother will react to Mark's sentence; how she'll cope if this dear support is taken from

her as she struggles with the vagaries of old age." App., Tab 7. Denise Saul notes that "Mark is the one (of his siblings) who sees his mother regularly and has the bulk of responsibility for her care. There is no one to replace his presence in her life. My husband … and my daughter, a geriatric social worker, have both dealt with her and know how negatively his incarceration will affect her." App., Tab 25. Mark's absence through a period of any incarceration would undoubtedly create a dramatic void in his mother's life, and set her back emotionally and physically.

**MARK'S PARTICIPATION IN THE OFFENSE CONDUCT**

In August 2008, Mark was a Senior Managing Director and General Partner of New Castle. He shared responsibility with his two partners for New Castle's approximately $1 billion in assets under management. Mark had day-to-day responsibility for managing this portfolio, which included the authority to make trading decisions on stocks held by the funds that New Castle advised.

Danielle Chiesi was a technology analyst for New Castle. She joined New Castle at its inception and achieved the title of Managing Director Principal, reporting directly to the General Partners. Chiesi also had trading authority, whereby she could purchase or sell any position within the technology sector in amount between 1% and 4% of fund assets, depending on the fund.

Chiesi's analyst role was mainly a research function, which included developing information from sources at issuers and in the market, all for the purpose of generating trading ideas for the Funds. Chiesi's sources included Moffat at IBM and a contact at Akamai. Mark, his partners and the analysts they employed, including Chiesi, would regularly discuss information and share opinions on a wide range of companies. Chiesi was an advocate for her

trading ideas; New Castle determined her compensation in part on the quality of her research and the success of her recommendations.

Regrettably, Mark permitted some of these discussions with Chiesi to go too far.  Chiesi gave to Mark what he knew to be misappropriated material non-public information concerning three companies which New Castle regularly followed and traded.

- In August and September of 2008, Moffat provided Chiesi with inside information concerning AMD's planned corporate restructuring, which she shared with Mark.  On one occasion Mark listened in on a phone call between Moffat and Chiesi.  New Castle's AMD trading resulted in a net loss for the Funds of approximately $4.7 million.  App., Tab 35.

- In late September 2008, Chiesi told Mark that she had learned from her source at Akamai that Akamai, which had been the subject of takeover rumors, would in fact be "taken out."  Following receipt of this "tip," which turned out to be erroneous, New Castle took positions in Akamai that led to a net loss for the Funds of approximately $1.1 million.  App., Tab 35.

- In January 2009, Moffat conveyed to Chiesi inside information concerning Sun's financial performance.  She in turn shared this information with Mark.  As a result of New Castle's Sun trading in this period, the Funds earned approximately $900,000.  App., Tab 35.

As a sophisticated market participant, Mark understood that Moffat, by misappropriating and providing to Chiesi information concerning AMD and Sun, had breached his duties to IBM as a company executive.  While certainly executives can in many instances properly discuss their own company's performance with analysts, it was altogether different when Moffat shared non-

public information concerning companies other than IBM.  It was simply not in IBM's interest for Moffat to share confidential information about these other companies.  The late September 2008 Akamai tip was also plainly prohibited information from an inside source.  Chiesi told Mark that her source had confirmed the rumor that Akamai would be acquired in a takeover transaction.  Mark understood that an insider was not free to share non-public information like that.

After receiving this information, the law required Mark and New Castle to abstain from trading.  He should have placed these stocks on New Castle's restricted list.  Instead, he permitted this information to be considered along with other factors in making trading decisions about three stocks that New Castle otherwise followed and in which the Funds had previously traded.  New Castle then took positions in these stocks that were typical considering the size of the portfolio.  Mark did not seek to exploit what he understood to be particularly valuable inside information by taking outsized or unusual positions or pursuing novel trading strategies.  Nor did Mark trade away from New Castle in any sort of effort to garner secret gains for himself.  Rather, Mark permitted New Castle to trade in three stocks while he and New Castle were in possession of material non-public information.

## ARGUMENT

### I.      THE COURT SHOULD IMPOSE A SENTENCE OF PROBATION

Like all criminal defendants, Mark deserves a rational and proportionate sentence that takes into account the totality of circumstances surrounding his crime and person.  Applying this standard, we respectfully submit that this Court should sentence Mark to probation.  A sentence of probation would be sufficient but not greater than necessary to fulfill the purposes of

sentencing, and is in line with sentences received by defendants who engaged in offense conduct comparable to and, in some cases, more serious than Mark's.  *See* 18 U.S.C. § 3553(a).

A custodial sentence is unnecessary to satisfy the sentencing goals of Title 18, United States Code, Section 3553(a), and would be unduly punitive.  Section 3553(a)'s requirement that sentences adequately protect the public and provide both a general and specific deterrent effect clearly does not require imprisonment.  The consequences of Mark's conviction – including his public shaming, the effect that his conviction has had on his family, the economic penalty to be imposed, his bar from the securities industry, and the end of his long and successful career as a money manager – have already addressed those aims.

## A.     Federal Sentencing Framework

Mark's sentence should be reached through consideration of all of the factors identified in Section 3553(a), including the advisory Sentencing Guidelines.  *See United States v. Booker*, 543 U.S. 220 (2005); *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005)).  The "overarching" command of Section 3553(a) is the "Parsimony Clause," which "instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  *Kimbrough v. United States.*, 552 U.S. 85, 89 (2007).  Judges have freedom to exercise discretion in fitting sentences to a defendant's individual circumstances, *see Crosby*, 397 F.3d at 114, and to give "consideration [to] the judge's own sense of what is a fair and just sentence under all the circumstances."  *See United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## B.     Guidelines Considerations

Today, while judges must pay homage, the Guidelines are only advisory.  *Gall v. United States,* 552 U.S. 38, 46-47 (2007).  In no sense does the fact that the Guidelines' calculation

provides for a term of imprisonment create any form of presumption that a custodial sentence is appropriate, let alone required.  *See, e.g., Nelson v. United States*, 129 S.Ct. 890, 892 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."); *Rita v. United States*, 551 U.S. 338, 351 (2007) ("sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply").  While the Court is instructed to use the Guidelines as an initial benchmark, we submit that in this case the resulting calculation is of no utility, and would result in a sentence incongruous with the goals of Section 3553(a).

1. <u>Advisory Guidelines Range</u>

Under the plea agreement between the parties, the base offense level applicable to the insider trading offenses charged in the Information is 8.  *See* U.S.S.G. § 2B4.1.  The gain for which Mark is responsible is between $400,000 and $1,000,000 – all of which is derived from the January 2009 Sun trading – which increases the offense level by 14 under U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(h).  The parties further agreed that a three level reduction in the offense level under U.S.S.G. § 3E1.1 is warranted, bringing the adjusted offense level down to 19, before consideration of any adjustment for role in the offense.[2]  The plea agreement leaves the question of whether Mark played a minor role in the offense conduct to the Court.  As discussed below, we think that a role adjustment under U.S.S.C. § 3B1.2(b) is warranted here, taking the adjusted offense level down to 17, where the applicable adjusted Guidelines range is 24 to 30 months.

---

[2] The Probation Department followed the plea agreement on these Guidelines issues in the first disclosure of the PSR;  we do not anticipate that the amended PSR will change in this regard.

2.      Mark Qualifies as a Minor Participant in the Offense Conduct

Under U.S.S.G. § 3B1.2(b), a "minor participant" means any participant who is less culpable than most other participants, but whose role could not be described as minimal.  A determination of whether a minor role adjustment is appropriate is made "'by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable." *United States v. Pena*, 33 F.3d 2, 3 (2d Cir. 1994) (quoting *United States v. Lopez*, 937 F.2d 716 (2d Cir. 1991)).  The analysis includes "measuring each participant's individual acts and relative culpability against the elements of the offense of conviction," *id.*, and considering the defendant's conduct against an "average participant" in such a crime.  *United States v. Rahman*, 189 F.3d 88, 159 (2d Cir. 1999).  Applying these standards, Mark's role in the offense conduct warrants a two-level minor role adjustment.

Plainly, most touchstones of insider trading cases are absent as to Mark.  Insider trading defendants routinely pay for inside information or exchange other inside information for the inside information provided by their source.  *See, e.g.*, *United States v. Geibel*, 369 F.3d 682, 686 (2d Cir. 2004) (co-conspirator provided inside information to approximately 15-20 individuals in exchange for a percentage of their trading profits); *United States v. Cusimano*, 123 F.3d 83, 86 (2d Cir. 1997) (defendant paid co-conspirator cash installments in exchange for inside information); *United States v. Teicher*, 987 F.2d 112, 114-15 (2d Cir. 1993) (defendant tipped co-conspirator inside information in exchange for other inside information); *United States v. Holzer*, 09 Cr. 470 (VM), Information, May 7, 2009 (S.D.N.Y.), pg. 5 (defendant shared illicit trading profits with source of inside information); *United States v. Franklin*, 07 Cr. 164 (GEL), Information, Feb. 27, 2007, p. 2 (S.D.N.Y.) (defendant paid several hundred thousand dollars in exchange for inside information); *United States v. Collotta*, 07 Cr. 143 (VM), Superseding

Information, May 10, 2007 (S.D.N.Y) (tippee shared proceeds of unlawful trades with tipper).  In addition, insider trading defendants often attempt to conceal their unlawful trading by using friends or relatives to trade on their behalf or by establishing accounts on behalf of third parties, while maintaining exclusive control of the trading within such accounts and keeping the profits for themselves.  *See, e.g.*, *Holzer*, 09 Cr. 470 (VM), Sentencing Tr., Sept. 29, 2009 (S.D.N.Y.), p. 18 (defendant used relative's account to carry out scheme); *United States v. Xujia Wang, et al.*, 07 Cr. 00730 (DC), Information, Aug. 7, 2007 (S.D.N.Y.), pgs. 7-10 (defendants executed trades in secret accounts they set up in parent's name to hide their activity from their employers).  Further, insider trading defendants regularly pass inside information they obtain on to friends, family members and business associates with full knowledge that such parties are likely to trade on the information.  *United States v. Babcock*, 07 Cr. 154 (RJH), Information, Feb. 28, 2007, p. 4 (S.D.N.Y) (defendant tipped other co-conspirators and asked the co-conspirators to purchase stock on his behalf); *United States v. Okada*, 07 Cr. 144 (DC), Indictment, Feb. 26, 2007, p. 4 (S.D.N.Y.) (defendant tipped a relative); *United States v. Goehring*, 05 Cr. 209 (JES), Indictment, Feb. 24, 2005, p. 3 (S.D.N.Y.) (defendant tipped a friend).

The allegations against Mark's co-conspirators – Chiesi and Moffat – provide further support for a minor role adjustment.  Moffat repeatedly disclosed material non-public information he obtained through his employment as a senior executive at IBM.  *United States. v. Robert Moffat*, 10 Cr. 270 (DAB) ("Moffat Information"), App., Tab 37 (¶¶ 7, 8, 12a, 12c-d, and 13c).  The information he disclosed concerned not only IBM, but multiple other companies with whom IBM did business, including Sun.  *Id.* (¶¶ 7, 8, 12a).  Chiesi actively solicited inside information on multiple occasions from Moffat and others concerning a host of companies.  She specifically sought out information of a nature and quality which she knew New Castle could not

be in possession of while trading.  While Mark does not deny his own culpability, Chiesi is responsible for involving him in the unlawful inside trading conspiracy.  Mark is significantly less culpable than Chiesi and Moffat.

The conduct of the nearly two dozen other criminal defendants in the so-called Galleon insider trading cases also support a minor role adjustment for Mark.  Many of the defendants who have pleaded guilty in overlapping or related conspiracies engaged in conduct that is more serious than Mark's, and a look at their conduct puts Mark's role into its proper context.  Several defendants who have pleaded guilty were insiders who sold stolen inside information to line their pockets.  *See, e.g., United States v. Rajiv Goel*, 10 Cr. 90 (AKH) (receiving money and having securities transactions executed on his behalf in exchange for inside information); *United States v. Anil Kumar*, 10 Cr. 13 (DC) (receiving several million dollars in exchange for inside information); *United States v. Brien Santarlas*, 09 Cr. 1170 (PKC) (misappropriating material nonpublic information in exchange for thousands of dollars); *United States v. Gautham Shankar*, 09 Cr. 996 (VM) (receiving cash payments in exchange for inside information); *United States v. Roomy Khan*, 09 Cr. 991 (RMB) (receiving hundreds of thousands of dollars in exchange for inside information).  Others paid large sums of money to obtain misappropriated information for illegal trading.  *See, e.g.*, *United States v. Ali Far*, 09 Cr. 1009 (RPP); *Shankar*, 09 Cr. 996 (VM); *United States v. Richard Choo-Beng Lee*, 09 Cr. 972 (PKC).  Still other "Galleon" defendants who have pleaded guilty peddled inside information for access to additional inside or other valuable information or services.  *See, e.g.*, *United States v. Ali Hariri*, 10 Cr. 173 (RJH) (received advice on buying and selling the securities of other publicly traded companies in exchange for inside information); *United States v. Steve Fortuna*, 09 Cr. 1003 (SHS); *Shankar*, 09 Cr. 996; *Khan*, 09 Cr. 991; *Lee*, 09 Cr. 972.  The allegations against Raj Rajaratnam further

illustrate that Mark deserves minor role treatment.  The government alleges that Rajaratnam traded illegally in thirty-five different stocks, reaping $45 million in illicit gains or losses avoided and that, in exchange for the inside information, he compensated his sources with large sums of money or other tips based on inside information.  *United States v. Rajaratnam*, 09-Cr-1184 (RJH), Superseding Indictment, Feb. 9, 2010 (S.D.N.Y.).  According to the allegations, Rajaratnam exploited inside information as a central part of his hedge fund's portfolio management strategy.

While Mark failed to prevent New Castle from trading while he and Chiesi possessed inside information – a serious and indeed criminal lapse under the federal securities laws – his conduct nonetheless lacks the typical attributes of insider trading and is simply less serious than "average."  We therefore respectfully submit that this Court should find that Mark was a minor participant in the offense conduct, and grant him a two-level downward adjustment under §3B1.2(b) of the Sentencing Guidelines.  *See United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002); *United States v. Cusimano*, 123 F.3d 83, n.7 (2d Cir. 1997) (noting that a defendant who reaped substantial personal profits from illicit trading and provided financial compensation to tippers received minor role adjustment).  With this reduction, Mark's Guidelines offense level is 17, and his advisory sentencing range is 24-30 months.

3.    A Downward Departure From the Guidelines
      Range Based Upon Mark's Health Issues Is Supported

U.S.S.G. § 5H1.4 provides for a downward departure based on a defendant's "extraordinary physical impairment."  Courts in this jurisdiction have consistently held that a defendant is entitled to a downward departure from the Sentencing Guidelines when his physical impairment is extraordinary.  *See United States v. Jimenez*, 212 F. Supp. 2d 214, 219 (S.D.N.Y.

2002).  For instance in *Jimenez*, the court held that the defendant was entitled to a downward departure because she suffered a brain aneurism that was exceptional enough to "erode[] her capacity to threaten society."  *Id.*  Similarly in *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996), the Court of Appeals held that since the defendant "had a kidney transplant over 20 years ago, and his new kidney is diseased [and] he must receive regular blood tests and prescription medicines [and as a result] contracted a rare bone disease," the district court's downward departure on physical impairment grounds was warranted.  *See also United States v. Vaughan*, 1993 WL 119704, at *1 (S.D.N.Y. Apr. 15, 1993) (finding that a downward departure was appropriate due to defendant's continuing treatment for lymphoma cancer).

Mark's physical ailments are sufficient to warrant a downward departure.  Mark was diagnosed with prostate cancer in 2005 and while his cancer has luckily gone in to remission, he must undergo regular testing to track whether it has returned.  Moreover Mark suffers from hyperlipidemia and diabetes mellitus such that he has 30-50% stenosis in the right coronary artery.  Mark is being treated with medication for this ailment and requires regular monitoring. As such, Mark's health issues provide a basis to depart from the advisory Guidelines.

**C.    The Nature and Circumstances of Mark's Offense Support**
**a Below-Guidelines Sentence of Probation Under Section 3553(a)(1)**

1.    Mark's Offense Conduct is Not Typical of Insider Trading Defendants

As our argument on the minor role adjustment makes clear, Mark's conduct is not typical of insider trading defendants.  As to him, the case lacks the aggravating factors usually present: payoffs to gain access to material non-public information, secret accounts or trading in other accounts to conceal illegal activity, the sharing, usually in secret ways, of illegal trading profits, and other "badges of fraud" common in the insider trading context.  Mark, as a downstream

tippee who simply let the unlawful information influence his trading judgment, should be considered at the lowest end of the spectrum of insider trading culpability.

2.      Mark Did Not Profit Personally

In addition, it is a significant mitigating circumstance that Mark did not profit personally. Indeed, there is no indication that Mark ever sought in any way to misuse any inside information for direct personal gain.  All of the trades at issue were done in the accounts of the Funds that New Castle managed and for the benefit of New Castle investors.  Impermissible, to be sure, but far less serious than, for example, a scheme designed to generate secret personal profits in an off-shore account.

3.      Mark Did Not Seek to Exploit Inside Information

Further, the evidence shows that Mark did not seek to exploit the information for the Funds' benefit by engaging in unusual trading activity or by taking on larger than typical positions.  In the context of these Funds, the positions were small as a relative matter.  In the run-up to the Sun earnings announcement, the Funds' position in the company's stock reached only 0.81% of assets under management.  Similarly, the Akamai position New Castle maintained in the weeks following the Chiesi-Akamai conversations in late September 2008 never exceeded 0.80%, while the AMD position between August 1 and October 7, 2008 topped out at 1.64%. During these periods, the Funds held positions of comparable or greater size in a wide array of stocks.  Even within the range of the typical size of positions at New Castle, Mark could have taken much larger positions.

4.      Gain Is A Terrible Measure of Culpability In This Case

Indeed, the only factor that could be considered "aggravating" is the size of the unlawful gain earned by the Funds.  The roughly $900,000 in gross gain on the Sun trades is the only

reason that the Guidelines in this case suggest a term of incarceration.  We submit, however, that the gross gain from the Sun trades is a terrible measuring stick for Mark's culpability.  It would be unjust to imprison him on the basis of those gains.

Consider first that the gain for Guidelines purposes are gross gains.  However, the economic reality of the trading activity within the scope of the conspiracy charged in the Information is that the New Castle Funds net loss on these trades amounted to approximately $4.8 million.  It is impossible to say what accounted for these losses:  market forces, bad luck, or the poor quality or outright falsity of some of the information at issue.  Perhaps what was thought to be material information turned out not to be when real market forces were at work.  Whatever the reason, if the Guidelines measure insider trading "harm" in terms of gain, the real answer here is that no "net harm" was done to the market.

A second reason to disregard gross gain as a measure of culpability is that, in this case, the amount of gain does not correspond to any increase in the desire to do wrong or violate the law – it reflects neither a more culpable mental state, nor a more wrongful act.  In the absence of any indication that Mark sought to exploit the information through larger position sizes or unusual trading activity, the issue really boils down this:  Mark was running a billion dollars. Any trade that was "typical" for a fund this large would potentially generate gains that would be outsized by Guidelines standards.  When the Sun trade turned out to be a winner, it generated gain that is very significant for Guidelines purposes even though it was a small position for this portfolio.

The relevant question should be:  Is the incremental punishment suggested by the Guidelines a sound indicator of increased culpability?  We think that it is not because there is no indication that the additional gain shows any intent to commit a more serious crime.  In this case,

the gain is simply a function of a typical trade in a large portfolio.  Had Mark been running $100 million, all else being equal, the gain would have been only $90,000 and Mark's Guidelines exposure would be significantly reduced.  Yet his real culpability would be exactly the same;  he would be the same sophisticated market professional who knew better and knew that he was required to "pass' on any trade while he had possession of inside information.  Mark's lapse is not one that can be measured in dollars.

**D.    A Sentence of Probation Would Promote Consistency in Sentencing**

A critical factor to be considered by this Court under Section 3553(a) is the need to avoid unwarranted sentence disparities.  *See* 18 U.S.C. § 3553(a)(6).  Given the recent sentences in insider trading cases in this District, as well the level at which the government's case against Robert Moffat, a more culpable co-conspirator, has been resolved,  this factor strongly favors a sentence of probation.

1.    Insider Trading Sentences in this District
      Demonstrate That Probation Is Appropriate

A review of recent insider trading cases in this District and the sentences imposed reveals that non-cooperating defendants who did not engage in aggravated conduct are treated with leniency, often receiving probationary sentences or sentences at levels substantially below the advisory Guidelines ranges.    In fact, substantially below-Guidelines sentences have been imposed on defendants significantly more culpable than Mark, including some convicted after trial for tipping inside information and other more egregious conduct.  *See, e.g., United States v. Gansman*, 08 Cr. 471 (MGC) (May 27, 2008).  We have attached at Tab 38 of the Appendix descriptions of the key sentencing facts in eleven recent cases.  To be sure, every case is different and some cases feature unique circumstances warranting leniency.  But the clear takeaways from

this survey are that a below-Guidelines sentence is the norm and that a sentence of probation for non-aggravated conduct is imposed in nearly every case.

Tippee-defendants who traded on information for personal profit fared quite well. In fact, even the defendants who engaged in quid pro quo type activity, compensating their sources of information, or who passed on the inside information to others were afforded leniency: Every one of these defendants received below-Guidelines sentences, often with little or no jail time. *See* App., Tab 38 (*summarizing United States v. Holzer*, 09 Cr. 470 (VM); *United States v. Koulouroudis*, 09 Cr. 440 (PGG); *United States v. Paparrizos*, 09 Cr. 400 (PAC), *United States v. Okada*, 07 Cr. 144 (DC)). For reasons set forth above, Mark is less culpable than these individuals – he did not seek to personally profit from his unlawful activity, he did not offer or provide any kind of remuneration in return for inside information, and he did not share any inside information he received with friends, family or business associates.

In addition, many of the cases presented in Appendix Tab 38 involved tippers who breached duties to their employers by misappropriating material non-public information and trading on it or providing it to third-parties for trading. Each of these tipper-defendants also received a significantly below-Guidelines, and in some cases non-custodial, sentences. *See United States v. Collotta*, 07 Cr. 143 (VM); *United States v. Goehring*, 05 Cr. 209 (JES); *United States v. McDermott et al.*, 00 Cr. 0061 (RO). These outcomes offer even greater support for the sentence of probation we propose.

The Supreme Court has made clear that Mark, as a downstream tippee, is less culpable than "insiders and broker-dealers who selectively disclose[d] material nonpublic information." *See Bateman, Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313 (1985) ("In the context of insider trading, we do not believe that a person whose liability is solely derivative can be said to

be as culpable as one whose breach of duty gave rise to that liability in the first place.").[3]   In

explaining its position, the Supreme Court rightly characterized the insider as the "fountainhead"

of an insider trading scheme, and observed that:

> [I]nsiders and broker-dealers who selectively disclose material
> nonpublic information commit a potentially broader range of
> violations than do tippees who trade on the basis of that
> information.  A tippee trading on inside information will in many
> circumstances be guilty of fraud against individual shareholders, a
> violation for which the tipper shares responsibility.   But the
> insider, in disclosing such information, also frequently breaches
> fiduciary duties toward the issuer itself. . . .  ***Absent other culpable
> actions by a tippee that can fairly be said to outweigh these
> violations by insiders and broker-dealers, we do not believe that
> the tippee properly can be characterized as being of substantially
> equal culpability as his tippers."*** *Id*. at 313-14 (citations and
> footnotes omitted).

The Supreme Court added that "deterrence of insider trading most frequently will be maximized

by bringing enforcement pressures to bear on the sources of such information – corporate

insiders and broker-dealers."  *Id.* at 316; *see also SEC v. Thome*, 638 F. Supp 596, 617 (S.D.N.Y.

1986) ("the tipper's conduct, almost invariably, is more culpable than that of the tippee").

Judge McMahon recognized this distinction in sentencing an insider-tipper – Xujia Wang

– whose case is discussed at Appendix Tab 48, commenting to her that "you are more culpable

[than your husband-tippee]: you are the thief."   Xujia Wang, et al., 07 Cr. 00730 (DC),

Sentencing Tr., Dec. 4, 2007 (S.D.N.Y.), p. 29.   The heightened culpability of tippers,

particularly insiders, is reflected in the Guidelines' two level enhancement for abuse of trust

which is typically used to increase a tipper's offense level – before any unlawful gain is factored

---

[3] The Supreme Court referenced the legislative history of the Insider Trading Sanctions Act of 1984, § 2, 15 U.S.C.
§ 78u(d)(2) (1982), as support for its position on the relative culpability of tippers and tippees.  The legislative
history provides that "[a]bsent the tipper's misconduct, the tippee's trading would not occur" and a tipper is therefore
"most directly culpable in a violation."   *Bateman*, 472 U.S. at n.23 (citing H.R.Rep. No. 98-355, at 9, U.S. Code
Cong. & Admin. News 1984, p. 2282).

into the equation.  Given the sentences imposed on these more culpable tippers, a sentence of probation is clearly both sufficient and appropriate in Mark's case.

       2.       The Resolution of the Criminal Case Against
                Robert Moffat Supports Imposing a Sentence of Probation

The Second Circuit has recognized that it is in fact "appropriate for a district court . . . to impose a sentence that . . . reflect[s] the extent to which the participants in a crime are similarly (or dissimilarly) situated and tailor the sentences accordingly."  *See United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007), *abrogated on other grounds by United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008)).   Applying this principle, the resolution of the criminal case against Robert Moffat, and with it the near certainty that he will receive a sentence of probation, provide additional strong support for imposing a sentence of probation on Mark.  On March 29, 2010, Moffat pleaded guilty to conspiracy to commit securities fraud and securities fraud. During the relevant time period, Moffat was the senior vice president of IBM's systems and technology group and was viewed as a possible candidate for the IBM chief executive job.  He allocuted to leaking inside information about IBM, Lenovo Group Ltd. and AMD from August to October 2008.  Moffat learned the information about Lenovo because he served as a non-voting member of its board of directors, and about AMD because IBM was negotiating a licensing agreement with AMD in connection with its restructuring.  Moffat's plea agreement with the government provides for a stipulated guidelines range of 0-6 months' imprisonment.

There is no reasonable view of the facts in this case in which Mark, a tippee, is more culpable than Moffat, the insider subject to a duty of trust and confidence to IBM.  As discussed above, generally, the tipper in an insider trading scheme – the "thief" in Judge McMahon's words – is always more culpable than a tippee because the tipper, in breaching his duty of trust

and confidence, commits the initial unlawful disclosure and enables the course of illegal trading conduct that follows.

Here, all of the gains that are used to increase Mark's offense level, approximately $900,000, were generated in trading in Sun.  As detailed in the Information, Moffat was the source of this information.  This is the theory of liability to which Mark pleaded guilty and as to which the government indicated at Mark's plea that it had sufficient evidence.  Generally speaking, the tipper would be held accountable for the gains reasonably foreseeable to him.  While it is unclear why that did not occur here, it is hard to imagine what objective reason could exist for the more favorable treatment accorded Moffat when all of Mark's liability on the Sun trades is derivative of Moffat's and Mark engaged in no aggravated conduct.

It seems to us that the government has re-calibrated the benchmarks for appropriate sentences in this case through a plea agreement with Moffat that virtually assures him a no-jail sentence.  We respectfully suggest that the Court use this new benchmark together with an informed approach to relative culpability in this case to impose a sentence of probation for Mark.  Given their respective roles, an outcome that leaves Mark with a substantial sentence of incarceration while Moffat receives probation is simply unfair.  This is exactly the type of sentencing disparity that should be avoided under Section 3553(a).  *See United States v. Wills*, 476 F.3d at 109-10 .

**E.    Mark's Personal History and Characteristics Are Mitigating Factors Supporting a Below-Guidelines Sentence of Probation Under Section 3553(a)(1)**

Mark is a humble, loyal, down-to-earth person, who despite his financial success has never forgotten his working class roots.  The offense conduct is truly aberrational and does not comport with the life Mark has lived, filled with humility, honesty, integrity and concern for the

welfare of others.  This life is reflected in Mark's personal history described in detail above, and in the flood of letters of support submitted on his behalf.  Mark's many positive contributions – including his unwavering commitment to his investors, financial and emotional philanthropy, and dedication to his ailing mother – provide substantial grounds for imposing a below-Guidelines sentence of probation.  Mark's character is conveyed in this anecdote from Denise Saul:

> I will always remember when Mark and I served on the board of our local swim club.  An older woman who had been appointed recording secretary was having difficulty performing her job.  Most of the board members wanted her to resign but Mark came to her aid by volunteering to tape record the meetings and help her transcribe the minutes.  She was able to save face.  It was one of those small moments which define a person's character.

App., Tab 25.  Another friend writes about how Mark assisted their son with the financial burden of adoption after years of infertility treatment had ravaged them financially.  Indeed, numerous people have written on Mark's behalf, with stories of this nature, citing and reflecting how truly out of character the offense conduct appears.  Peggy Kurland notes that "[o]ur housekeeper has a very bright daughter who was fearful of attending a very tough local high school so Mark arranged to pay her tuition in a private Catholic high school.  I am proud to report, she is currently awaiting word from Duke University."  App., Tab 15.

Not surprisingly, the over two dozen submissions received on Mark's behalf uniformly express surprise that he, of all people, would participate in unlawful activity.  For example, John Kellenyi, a friend of Mark's and investor in New Castle, writes:

> I strongly believe and can attest that the actions he's charged with are inconsistent with Mark's long term, high quality character.  He was consistently held in high regard in the financial community, not only as an astute analyst but also as a quality person.  As a well recognized Securities Analyst, Associate Director of Equities

> Research and finally Director of Equities Research at Drexel Burnham Lambert Inc. in New York I was well positioned to be made aware of analysts' reputations.  Mark Kurland checked out very well.  In sum, he's a good man.

App., Tab 12.  Douglas P. Catalano, Esq., a friend of Mark's from college, mirrors the disbelief of others at the lapse in Mark's judgment:

> It is inconceivable for me to understand how Kurland came to be involved in circumstances which I know throughout the last 42 years to be totally at odds with his behavior and character. … Mark has been … charitable to a fault, and without any past transgressions which might suggest the behavior which prompted his plea arrangement.

App., Tab 2.  Letter after letter speaks to Mark's honesty and integrity: *See, e.g,* App., Tabs 4, 14-17, 30.  We invite the Court to review the entirety of these and the other submissions to obtain a complete picture of Mark.

The relevance to Mark' sentence of his pre-arrest dedication to charity and community service cannot be understated.  Judge Preska recently affirmed its importance when imposing a below-Guidelines sentence of probation on Laurence McKeever:

> I think the defense submissions, particularly the letters, have made clear this defendant's particular devotion to his community and devotion to his family.  I note that unlike many of the defendants we see and particularly many of the white collar criminal defendants we see, Mr. McKeever has been giving unselfishly of himself far before this case ever arose.  [The continuing donations] again in contrast to many of the white collar defendants we see here, [were made] in an unostentatious, unselfish way, to give to the community around him...his truly unselfish devotion in giving to those around him and not looking for recognition in the way that we see so many white collar defendants seeking, particularly after they've been arrested.  We do not see that here.[4]

---

[4] *United States v. McKeever*, 07 Cr. 42, Sentencing Tr., May 20, 2008 (S.D.N.Y.), pgs. 17-18.  McKeever pleaded guilty to receiving money in exchange for concealing an insider trading scheme from higher level management at his broker-dealer employer.

These attributes as reflected in the submissions made on Mark's behalf reflect his true nature and character, and reinforce the propriety of a significant divergence from the Guidelines in imposing sentence.

The specter of criminal prosecution and sentencing has not curtailed Mark's benevolence and concern for others.  Sally Waranch Rajcic, the daughter of one of Mark's first investors views Mark as a "friend, [] advisor and person I trust with everything."  She writes that since her father passed in January of this year "there has not been a week gone by that Mark has not contacted me to check on me.  To make sure I was ok."  App., Tab 23.

**F.     A Sentence of Probation Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment for the Offense, Affords Adequate Deterrence to Criminal Conduct, and Protects the Public from Further Crimes of the Defendant.**

Probation is a meaningful and significant sentence for defendants such as Mark. Significant restrictions are imposed on "[o]ffenders on probation," and sentencing a defendant to probation is not an act of leniency.  *Gall*, 552 U.S. at 48.  Mark will likely be "subject to several standard conditions that substantially restrict [his] liberty."  *Id.*  These restrictions may include being unable to leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, his "probation officer or the court."  He may be required to "report regularly to [his] probation officer, permit unannounced visits to [his] home[], refrain from associating with any person convicted of a felony, and refrain from excessive drinking." *Id.*   And certainly "harsh consequences . . . await" he who "violates the conditions of his probationary term."  *Id.* at 44 (quotations and citations omitted).

Any government interest in punishing Mark for his criminal conduct can surely be fully satisfied through probation.  *See United States v. Brady*, 2004 WL 86414, at *8-9 (E.D.N.Y. Jan.

20, 2004) ("Probation is viewed by many as rehabilitative in nature ... However, probation is also a punitive measure, and 'may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.'") (quoting U.S.S.G. Manual ch. 5, pt. B, introductory cmt.).  In addition, recidivism is a non-issue for Mark, and both specific and general deterrence interests are being met and will be further enhanced by a sentence of probation.  Non-Guidelines sentences are particularly appropriate in the cases of older, first time offenders because the Guidelines do not take into account the fact that defendants who are over the age of forty "exhibit markedly lower rates of recidivism in comparison to younger defendants."  *United States v. Carmona-Rodriguez*, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (citations omitted); *United States v. Hernandez*, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (imposing lower non-Guidelines sentence on 49-year old defendant in part because defendant was over 40).

Mark's punishment is already underway and is severe.  Mark is devastated both physically and mentally by the harm and grief his crimes have caused his wife, his business, and his many friends and family members who love him, look up to him and rely on him.  He suffers extreme embarrassment and shame which will never relent.  As Peggy explains:

> The notoriety of this case has greatly impacted our family, with stories on the Internet, newspapers and TV even simple things have become a negative ordeal for us.  The worst of the wire taps of Mark's private conversations have allowed the public into the privacy of our lives.  This will be available to any and all to view forever.  We have had to leave restaurants because of loud gossiping.  It has gotten to the point where I am contemplating resigning my teaching position at a local school after fourteen years.  The curiosity and constant questions have made it

impossible for me to spend my time teaching effectively.  Mark is
encouraging me not to give up my passion since he knows first
hand how devastating this can be.  Although you may feel Mark
brought this on himself, the rest of us are also paying a very hefty
price – the notoriety of this case will live with us forever.  Our
family will never again have a comfortable day in public.  This
shame will never leave us, since details of our family and our lives
will always be available.

App., Tab 15.

Separate and apart from the sentence that this Court may impose – but of the utmost

relevance to determining what that sentence should be – Mark is finished managing money and

will be barred from the securities industry.  The loss of the business he built and the challenges

and opportunities it presented will leave a huge void in his life until the day he dies.  Peggy has

observed that "not the least of the punishments Mark has endured is the loss of the profession

and fund he was so passionate about.  He has lost the respect and admiration he has spent a

lifetime building.  He no longer has the ability to earn a living, which he finds very humiliating,

in addition to problematic." *Id.*

Mark is a first time offender, and is deeply remorseful for the poor judgment he exercised

and the unlawful activity in which he engaged.  His life of 61 years has been predicated on hard-

work and an innate, selfless drive to help others ranging from family members, to friends, to

acquaintances to total strangers.  He has been a pillar amongst his friends and his community and

has been a true asset to society.  He is not a criminal from whom the public needs protection and

sending him to jail would accomplish nothing from a deterrence standpoint.  Rather, society will

benefit from Mark's positive works if he is given the chance.

## CONCLUSION

For all the foregoing reasons, we respectfully request that the Court sentence Mark Kurland to a term of probation.

Dated: New York, New York
        May 10, 2010

Respectfully submitted,

DLA PIPER LLP (US)

By:     /s/ Patrick J. Smith_____

Patrick J. Smith
Theodore A. Altman
Jeffrey D. Rotenberg
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

*Attorneys for Defendant Mark Kurland*