REDACTED FOR

PUBLIC FILING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                           :

UNITED STATES OF AMERICA       :

    -v.-                       :

MARK KURLAND,            :

              Defendant.   :

                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

**FILED UNDER SEAL**

10 Cr. 69 (VM)

**GOVERNMENT'S SENTENCING MEMORANDUM**

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
of America

REED M. BRODSKY
Assistant United States Attorney
ANDREW Z. MICHAELSON
Special Assistant U.S. Attorney

- Of Counsel -

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................ii

Preliminary Statement ...............................................................................................1

I.  The Insider Trading Scheme ..................................................................................2

    A.  Insider Trading in AMD ....................................................................................4

    B.  Insider Trading in Sun ......................................................................................7

    C.  Insider Trading in Akamai ................................................................................9

II. Minor Participant ................................................................................................10

III.  Extraordinary Physical Impairment ..................................................................12

IV.  3553(a) Factors ...............................................................................................13

    A. Nature and Circumstances of the Offense, History and Characteristics
        of the Defendant ..........................................................................................13

    B.  Need to Promote Respect for the Law and Afford Adequate Deterrence .................15

    C.  Need to Avoid Unwarranted Sentence Disparity .......................................................16

V. Conclusion ........................................................................................................18

## TABLE OF AUTHORITIES

*United States v. Bates*, 2007 WL 2780551 (E.D.Mich. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Castano*, 234 F.3d 111 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Garcia*, 920 F.2d 153 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Guttenberg*, 07 Cr. 141 (DAB) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Heffernan*, 43 F.3d 1144 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Imtiaz*, 81 F.3d 262 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Jimenez,* 212 F.Supp.2d 214 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Mayo*, 2000 WL 190573 (E.D.Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Naseem*, 07 Cr. 610 (S.D.N.Y. May 30, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Persico*, 164 F.3d 796 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Shonubi*, 998 F.2d 84 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Taylor*, 92 F.3d 1313 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                 :

UNITED STATES OF AMERICA      :

          :          **FILED UNDER SEAL**

    -v.-          :

          :          10 Cr. 69 (VM)

MARK KURLAND,        :

             Defendant.    :

          :

          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of the defendant Mark Kurland, and in response to the defendant's sentencing memorandum (hereinafter the "Kurland Memo."). The Government respectfully submits that a sentence within the Sentencing Guidelines range is appropriate.

From mid-August 2008 through January 2009, while managing a hedge fund, Mark Kurland participated in a vast insider trading scheme involving trading in the securities of several public companies, over the course of several months, based on tips from multiple inside sources. In the course of the conspiracy,



Kurland's scheme realized profits of about $900,000 based on insider trading in the securities of Sun Microsystems ("Sun") in January 2009, and it probably would

have netted significantly more profit had a fiscal crisis not caused a broad decline in the market in September and October 2008.

Kurland was caught because in August 2008, the Government obtained court authorization pursuant to Title III to intercept wire communications over phones used by Danielle Chiesi, his employee and co-conspirator. Wiretaps caught him in the act.

A principal purpose of the securities laws is to protect the integrity of the markets that enable our country's economy to flourish. Mark Kurland was a pillar of the investment community. In 1990, Kurland joined Bear Stearns as its global head of research, and in 1995 he ascended to become the chairman and chief executive of Bear Stearns Asset Management. At the time of the crimes, Kurland managed a hedge fund with approximately $1 billion in assets under management that, like all hedge funds, was open to only the most sophisticated investors. When the investing public suspects that Wall Street is rigged, or that Wall Street professionals have privileged access to information, those fears are directed to professionals like Kurland. When someone like Kurland is caught on tape engaging in the crimes that he committed, those suspicions are confirmed, the integrity of our markets is undermined, and the purpose of the securities fraud statutes is flouted. A sentence within the guidelines range is needed to deter Wall Street professionals from engaging in similar offenses, and to restore integrity to the markets by reassuring the investing public that when Wall Street professionals like Kurland are caught red-handed, they are not treated with white gloves.

## I. The Insider Trading Scheme

Kurland managed a hedge fund, New Castle Partners ("New Castle"), that, during the relevant time period, had approximately $1 billion in assets under management and employed a

number of portfolio managers and analysts.  Among these employees was Chiesi, an analyst who also had limited trading authority in New Castle funds.[1]  From mid-August 2008 through January 2009, Kurland and Chiesi engaged in a conspiracy to commit insider trading pursuant to which they obtained Inside Information in breach of duties from executives at International Business Machines Corp. ("IBM") and Akamai Technologies, Inc. ("Akamai").  Kurland and Chiesi then executed securities trades in the securities of Akamai, Sun and Advanced Micro Devices ("AMD"), on the basis of Inside Information in accounts affiliated with New Castle.

Specifically, in furtherance of the conspiracy, Kurland and Chiesi obtained Inside Information regarding AMD and Sun from Robert Moffat, a senior vice president and group executive in IBM's Systems and Technology Group.  Moffat disclosed the Inside Information regarding AMD and Sun in breach of duties of trust and confidence owed by Moffat to IBM. Kurland and Chiesi then executed trades in the securities of AMD and Sun on the basis of Inside Information that they knew had been disclosed in violation of duties of trust and confidence. Their trading in Sun resulted in a profit of about $900,000.

Also in furtherance of the conspiracy, Chiesi obtained Inside Information about ██████ ████████████ from an employee of Akamai (the "Akamai Executive"), who provided this Inside Information to Chiesi in breach of duties of trust and confidence.  Chiesi disclosed the Inside Information to Kurland, and Kurland and Chiesi executed trades in the securities of Akamai on the basis of Inside Information that they knew had been disclosed in violation of duties of trust and confidence.

---

[1] Chiesi has been indicted by a grand jury in the Southern District of New York on three counts of conspiracy to commit securities fraud and seven substantive counts of securities fraud. Chiesi has pleaded not guilty and is presumed innocent until proven guilty at trial.

The following is a summary of the evidence regarding Kurland's criminal conspiracy. Much of this evidence was obtained from court-authorized wiretaps on phones used by Danielle Chiesi:



### A. Insider Trading in AMD

From mid-August 2008 through October 2008, Kurland and Chiesi engaged in insider trading in the securities of AMD. The Inside Information related to a corporate reorganization pursuant to which AMD spun off its manufacturing operations into a new joint venture. AMD announced the reorganization on October 7, 2008. Chiesi obtained Inside Information regarding the AMD reorganization from Moffat, an executive at AMD (the "AMD Executive") and from Raj Rajaratnam, a hedge fund manager. IBM was involved in the deal because AMD needed to obtain a license to use technology from IBM in connection with the deal.

On or about August 15, 2008,



---

² This Sentencing Memorandum is being filed under seal because Chiesi has moved to suppress this evidence in the matter of United States v. Raj Rajaratnam and Danielle Chiesi, 09 Cr. 1184 (RJH). At the time of this submission, the Government has not yet filed its opposition to Chiesi's motion.

 On this day, New Castle began buying shares of AMD stock.





From on or about August 15, 2008 through early September 2008, New Castle purchased AMD stock valued at tens of millions of dollars based in part on the Inside Information disclosed by Moffat.



On September 30, 2008, New Castle purchased approximately 127,600 shares of AMD common stock at a price of $4.51 per share.

On October 7, 2008, at approximately 8:00 a.m. (before the market opened), AMD announced plans to spin off its manufacturing operations in the form of a joint venture. At the time of the announcement, New Castle held approximately 2.3 million shares of AMD common stock. Following the announcement, AMD stock opened trading at a price of $5.27 per share, up

6

approximately 25 percent over the previous day's close. New Castle did not realize a profit from its trading in AMD stock during this time period due in part to the financial crisis that precipitated a broad decline in stock markets in September 2008. Between the date on which New Castle began to acquire shares of AMD stock (August 15, 2008), and the eve of the announcement of the AMD reorganization (October 6, 2008), shares of AMD stock fell from approximately $5.87 per share to approximately $4.23 per share (28 percent). Even though the share price of AMD went up following the announcement, New Castle did not immediately sell its shares, and it did not realize a profit when it began selling its stock several weeks later.

     B. <u>Insider Trading in Sun</u>

     In January 2009, Kurland and Chiesi realized a profit for New Castle of approximately $900,000 by placing trades in the securities of Sun based on Inside Information about a Sun quarterly earnings announcement disclosed by Moffat in breach of duties of trust and confidence.

     In December 2008, IBM and Sun entered into a confidentiality agreement in connection with discussions on the subject of a potential business acquisition. In January 2009, IBM conducted due diligence on Sun and took steps in anticipation of placing a bid to acquire Sun. On Thursday, January 22, 2009, pursuant to the confidentiality agreement in place between Sun and IBM, Sun provided IBM with a draft of its quarterly earnings release relating to the fiscal quarter that ended in December 2008. Sun expected to announce its earnings the following week. The draft of the announcement indicated, among other things, that Sun's revenue for the fiscal quarter ending in December 2008 was $3.22 billion, that Sun planned to take a $221 million restructuring charge in the quarter, and that (including the restructuring charge), Sun anticipated announcing a quarterly loss of 28 cents per share on a GAAP basis. Moffat received

7

a copy of Sun's draft quarterly earnings announcement.  Phone records indicate that Moffat and

Chiesi communicated by phone on Saturday, January 24, 2009.  (The Government was not

intercepting calls on the Chiesi Phones at this time.)  On Monday, January 26, 2009, New Castle

purchased 283,600 shares of Sun at a price of $3.80 per share.



On or about January 27, 2008, New Castle purchased an additional 784,900 shares of Sun

at prices ranging from $3.97 to $4.28 per share.  After the close of the market, Sun announced its

quarterly earnings.  Revenue for the quarter ending in December 2008 was $3.22 billion,

exceeding analysts' expectations of $3.16 billion. Sun also announced that it was taking

restructuring charges.  On the following day, shares of Sun opened at $4.32, up approximately

eight percent over the previous day's close.  Between January 28, 2009 and February 9, 2009,

New Castle sold approximately 949,900 shares of Sun stock, realizing a profit of approximately

$900,000.

C.  Insider Trading in Akamai

In late September 2008, Kurland and Chiesi executed trades in Akamai stock on the basis

of Inside Information that Chiesi obtained from the Akamai Executive.

On or about September 27, 2008, Chiesi attended a social event where she saw the

Akamai Executive.  On or about September 29,

2008, Chiesi sent an instant message indicating that she was buying Akamai stock because

Kurland thinks it's cheap.  Also on or about September 29, 2008, New Castle purchased shares

of Akamai stock.

## II. Minor Participant

The Government strongly disagrees with Kurland's argument that his role in the offense conduct warrants a two-level minor role adjustment.  (Kurland Memo. at 17-20)  Section 3B1.2 provides that a defendant's offense level should be decreased by two levels "[i]f the defendant was a minor participant in any criminal activity."  U.S.S.G. § 3B1.2(b).  The Guidelines define a "minor participant" as "any participant who is less culpable than most other participants, but whose role could not be described as minimal."   U.S.S.G. § 3B1.2, comment (n.3).  A defendant bears the burden of demonstrating that he is entitled to a minor role adjustment.  *See, e.g., United States v. Castano*, 234 F.3d 111, 113 (2d Cir. 2000); *United States v. Imtiaz*, 81 F.3d 262, 265 (2d Cir. 1996).

Whether a minor role reduction is warranted depends on factors such as "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise."  *United States v. Garcia*, 920 F.2d 153, 155 (2d Cir. 1990); *see also United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir. 1993).  This determination is "heavily dependent upon the facts of the particular case."  *Garcia*, 920 F.2d at 155.  To justify a two-level reduction, the defendant must have been substantially less culpable than the average participant in such a crime.  *United States v. Taylor*, 92 F.3d 1313, 1336 (2d Cir. 1996).

An analysis of the relevant factors articulated in *Garcia* reveals that Kurland's role was anything but minor.  The first factor is the defendant's relationship to other participants.  Here, Kurland was the boss.  Kurland had the power to fire Chiesi, to increase or decrease her role and

authority at New Castle, and to set her compensation.  Kurland, not Chiesi, ultimately decided

how big a position New Castle would take in the securities being bought and sold on the basis of

Inside Information.  Moreover,  Kurland had more to gain, personally, than any of the other

participants in the offense conduct.  As the owner of 40% of New Castle, Kurland stood to

benefit the most from the performance fee that New Castle captured on profitable trading (20%).

In addition, Kurland also stood to profit from his personal investment in New Castle.

The second factor relates to the importance of Kurland's participation in the crime.

Kurland participated proactively to ensure the criminal venture's success.  Thus,

Kurland's participation was anything but passive.  Kurland was not just following directions; he

was giving them.

Third, and finally, Kurland had awareness of the nature and scope of the criminal

enterprise.  Chiesi provided Kurland with regular updates on the Inside Information she was

receiving from Moffat and the Akamai Executive.  Chiesi and Kurland discussed whether and

when to execute securities on the basis of the Inside Information obtained, and it was Kurland –

and not Chiesi – who ultimately determined the size of New Castle's positions.

Kurland asserts that he was a minor participant because he was less culpable than an

11

"average participant" in the crime.  Kurland notes that he was not involved in paying inside

sources for information or in concealing his unlawful trading using accounts of third parties.

There is no support in the case law or Guidelines for a minor role based on <u>not</u> paying insiders

for information or <u>not</u> using nominee accounts for trading.  ██████████████████████

████████████████████████████████████████████████████  And whether he knew about

payments to insiders is beside the point, since he was nevertheless aware that he and Chiesi were

trading securities on the basis of Inside Information disclosed in breach of duties of trust and

confidence.  Many insider trading schemes do not involve payments of money to the source.

## III. Extraordinary Physical Impairment

Kurland also argues that a downward departure is warranted for "extraordinary physical

impairment" pursuant to U.S.S.G. § 5H1.4 due to his treatment for prostate cancer,

hyperlipidemia and diabetes mellitus.  (Kurland Memo. at 20-21)  As precedent Kurland cites the

cases of *United States v. Jimenez,* 212 F.Supp.2d 214 (S.D.N.Y. 2002) and *United States v.

Rioux,* 97 F.3d 648 (2d Cir. 1996), in which the defendants had suffered from the truly

extraordinary conditions of, respectively, a brain aneurism and a rare bone disease resulting from

a kidney transplant.

The standards for a downward departure on medical grounds are "strict."  *United States v.

Persico,* 164 F.3d 796, 806 (2d Cir. 1999) (citing *United States v. Altman,* 48 F.3d 96, 104 (2d

Cir. 1995) for proposition that a downward departure requires medical conditions that Bureau of

Prisons is unable to accommodate).  Kurland has not even argued, let alone demonstrated, that

the Bureau of Prisons cannot accommodate his conditions.  Kurland treats his conditions with

prescription medication and has not been hospitalized since his cancerous prostate gland was

removed in 2003.  Accordingly, a downward departure is not warranted.  *See United States v. Bates*, 2007 WL 2780551, *10 (E.D.Mich. 2007) (no downward departure or variance where the defendant was treated for prostate cancer, had diabetes and an enlarged heart, was taking twelve medications daily and was under the care of seven doctors); *United States v. Mayo*, 2000 WL 190573 (E.D.Pa. 2000) (defendant's prostate cancer did not warrant downward departure).

## IV. 3553(a) Factors

In determining a reasonable sentence, the sentencing judge is required to consider the factors set forth at 18 U.S.C. § 3553(a).  These factors include, among others, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (3) the need for afford adequate deterrence to criminal conduct; and (4) the need to avoid unwarranted sentence disparity.  *See* 18 U.S.C. § 3553(a)

### A.  Nature and Circumstances of the Offense, History and Characteristics of the Defendant

Kurland claims that his conduct was not typical of insider trading defendants and that it did not include the "badges of fraud" common in the insider trading context.  (Kurland Memo. at 21)  This is factually incorrect, since Kurland's badges of fraud included ███████████ █████████████████████████████████████████████████████████  Indeed, considering its breadth and audacity, Kurland's scheme is, if anything, more egregious than most. It was not a one-off transaction or event.  Rather, Kurland's criminal insider trading scheme involved (i) criminal conduct that spanned several months, (ii) insider trading in the securities of three different public companies, (iii) the participation of at least two different inside sources, (iv) ███████████████████████, and (v) the purchase and sale of tens of millions

13

dollars woth of stock.  The scheme was perpetrated at a $1 billion hedge fund, realized a profit of

$900,000, and probably would have realized even more were it not for the fiscal crisis in

September 2008 that coincided with insider trading in AMD.  The scheme left few if any tracks,

and was uncovered only because the Government had obtained court authorization to wiretap

phones used by his co-conspirator.  This is obviously not the type of scheme that cries out for

leniency.

Kurland also claims that he did not profit personally from the scheme (Kurland Memo. at

22), but he did, and in a number of ways.  For example, Kurland was an investor in New Castle,

and therefore stood to benefit as an investor in the funds.  In addition, New Castle earned a 20%

performance fee on all profits.  Kurland, as a co-owner of New Castle, was entitled to a share of

this performance fee.

Kurland also claims that gain is not an appropriate measure of culpability in this case

because certain trades lost money, and because larger gain does not indicate a more culpable

mental state.  Kurland, however, should not receive any benefit from the trades that lost money.

New Castle may well have made money were it not for the intervening financial crisis.  But more

importantly, crediting Kurland for any loss would create a truly perverse result, for it would

imply that anyone who has lost money engaging in insider trading faces no repurcussions for

trying to make that loss back by engaging in further insider trading.  Furthermore, the scheme's

profit of $900,000 may not seem like a lot compared to the size of Kurland's fund, but it was

every bit that large in its harm to victims and the integrity of the market.  Kurland had the mental

state to commit insider trading with millions of dollars in capital that turned a profit of $900,000.

That is a more culpable mental state than one held by a defendant engaging in insider trading

14

with less capital.

Finally, Kurland claims that he has a good character and engages in charitable works, and that the offense conduct was "aberrational." (Kurland Memo. at 28)  The breadth of the scheme – insider trading in several securities, over several months, based on tips from multiple sources – combined with its badges of fraud described above, forecloses the possibility that such conduct was truly "aberrational," and outweighs any mitigating impact of his personal history and characteristics.

B. <u>Need to Promote Respect for the Law and Afford Adequate Deterrence</u>

As a general matter, because insider trading schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct. *United States v. Naseem*, 07 Cr. 610 (S.D.N.Y. May 30, 2008) (Patterson, J.) ("There I feel we're talking about deterring other people.  I'm not sure the guideline offense is great enough.  This kind of conduct has been prosecuted before and it doesn't seem to deter people very much.  So that is a strong reason to adhere to the guideline calculation.... I think my conclusion is that this crime has to be deterred, it is has to be deterred by a stiff sentence."); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.")

In addition, a fundamental purpose of securities laws is to protect the integrity of the markets.  This is critical to the functioning of the nation's economy, which depends upon well-functioning markets for liquidity and access to capital.  When the investing public fears that Wall

Street is rigged, or that Wall Street professionals have special access to information not available to others, the integrity of the markets is undermined.  For this reason, it is especially important that Wall Street professionals abide by the law.

Mark Kurland was the essence of a Wall Street professional.  He formerly served as Bear Stearns' global head of research, and as the chairman and chief executive of Bear Stearns Asset Management.  He then became a hedge fund manager, controlling a fund with approximately $1 billion in assets under management that was open only to the most sophisticated investors.  When Kurland was caught engaging in insider trading in a scheme that spanned several months, several securities, and multiple sources of Inside Information, the public's faith in the integrity of the markets was shaken.

Were Kurland to receive a light sentence (or, as he urges, only probation), Wall Street professionals would be emboldened to engage in similar crimes, knowing that such schemes are difficult to detect and that even if they are caught, they will not face much, or any, time in jail.  In addition, such a sentence would further shake the public's integrity in the markets by sending the message to the investing public that even when Wall Street professionals are caught on tape engaging in an extensive insider trading conspiracy, they are only lightly punished.  To deter criminal conduct by Wall Street professionals like Kurland and effectuate the purpose of the securities fraud laws, a sentence within the Sentencing Guidelines range is warranted.

C.  Need to Avoid Unwarranted Sentence Disparity

Kurland cites a number of cases for the notion that a sentence below the Sentencing Guidelines range is warranted (see Kurland Memo. at 24-26) , but these cases are largely distinguishable for the simple reason that none involve the manager of a $1 billion hedge fund

16

who engaged in insider trading in several securities, over several months, based on Inside

Information from multiple sources, while ███████████████████████████████

████████. Kurland is simply more culpable than the defendants in those cases.

He is more similarly situated to two defendants who recently pleaded guilty in another

significant insider trading prosecution involving Wall Street professionals.  In *United States v.*

*Guttenberg*, 07 Cr. 141 (DAB), Mitchel Guttenberg, a former institutional client manager in the

equity research department at UBS, disclosed Inside Information to David Tavdy, a trader, about

analyst upgrades and downgrades.  Tavdy used the information to execute hundreds of securities

transactions, earning approximately $10 million in illegal profits.  The Honorable Deborah A.

Batts sentenced Guttenberg (the tipper) to 78 months' imprisonment, and Tavdy (the tippee) to

63 months' imprisonment.  Both sentences were within the applicable guidelines ranges.

Finally, Kurland argues that tippers, as the sources of inside information who breach a

duty, are generally more culpable than tippees, and he specifically notes in this regard that Robert

Moffat has entered into a plea agreement with the Government that provides for a stipulated

guidelines range of 0-6 months' imprisonment.  As noted above, however, the Tavdy sentence is

recent precedent of a tippee in a far-reaching insider trading scheme receiving a guidelines

sentence.  Kurland's conduct also warrants a guidelines sentence because of the number of

securities in which he traded based on Inside Information (three), the manner in which he

obtained some of this Inside Information ██████████████████████████████

███████████████████████████████████, the significant amount of capital

he put behind the trades (tens of millions of dollars), his potential for personal profit, and the fact

that he engaged in insider trading based on tips from not only Moffat but also other inside

17

sources.

## V. Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence within the

Guidelines sentencing range of 30-37 months is appropriate.

Dated:   New York, New York
         May 17, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____
     Reed M. Brodsky
     Assistant United States Attorney
     Andrew Z. Michaelson
     Special Assistant United States Attorney
     (212) 637-2492/2348

18